FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 3 0 2006

_____ER D. THOMAS, Clerk
By _____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ATLANTA ATTACHMENT COMPANY

        Plaintiff

v.

                            CIVIL ACTION NO.
                            1:05-CV-1071-ODE

LEGGETT & PLATT, INCORPORATED

        Defendant

ORDER

    This patent infringement action is currently before the Court on Defendant's Motion to Exclude the Expert Report and Testimony of Dale Lischer [#56]; Plaintiff's Motion to Exclude the Expert Declaration and Testimony of Thomas Sanfilippo [#55]; Defendant's Motion to Strike the Supplemental Declaration of Ben Kuchel [#44]; Defendant's Motion for Leave to File Sur-Reply Brief or Alternatively, to Strike Declarations [#69]; Plaintiff's Motion for Preliminary Injunction [#2]; and Plaintiff's Request for Expedited Hearing on its Motion for Preliminary Injunction [#3]. For the following reasons, Defendant's Motion to Exclude the Expert Report and Testimony of Dale Lischer is GRANTED IN PART and DENIED IN PART; Plaintiff's Motion to Exclude the Expert Declaration and Testimony of Thomas Sanfilippo is DENIED; Defendant's Motion to Strike the Supplemental Declaration of Ben Kuchel is DENIED; Defendant's Motion for Leave to File Attached Sur-Reply Brief in Response to Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction is GRANTED NUNC PRO TUNC; Plaintiff's Motion for Preliminary

Injunction is DENIED; and Plaintiff's Request for Expedited Hearing on its Motion for Preliminary Injunction is DENIED.

I.   Factual Background

Plaintiff Atlanta Attachment Company ("AAC") is a family owned business that develops and manufactures equipment for the sewn products industry. Defendant Leggett & Platt ("L&P") is a large manufacturer, ranked 397th on the Fortune 500, that supplies products to the mattress manufacturing industry. Defendant is alleged to have infringed two of Plaintiff's patents, both dealing with pillowtop mattress technology.

Put simply, a pillowtop mattress consists of a padded layer that is attached to a panel by a gusset, where the panel is attached to a mattress. The gusset is the connecting piece between the padded layer and the panel. The prior art method of attaching the gusset to the corners of the panel was to manually miter the gusset at each corner. The gusset was mitered by making a miter cut (a pie-shaped cut), then sewing the cut edges (the sides of the pie-shaped piece) together to create a corner. The mitering process required accurate measurements to ensure a smooth appearance at the corners. In addition, the process was time consuming. There was demand in the art for a more efficient way of attaching a pillowtop layer to a mattress. Engineers at Sealy conceived of the gusset being ruffled around the edges, rather than being mitered. Sealy and AAC entered into a confidential joint development effort to design a machine to make such a ruffled gusset. Sealy and AAC agreed that Sealy would seek patent protection for the ruffled gusset product, and that AAC would sell

2

the gusset ruffler machine only to Sealy.  On April 10, 2001, Sealy filed an application for what ultimately issued as U.S. Patent No. 6,574,815 ("the '815 Patent") on June 10, 2003.  The '815 Patent covers a ruffled gusset.

In the spring of 2001, L&P approached AAC about the possibility of acquiring AAC.  As part of those discussions, L&P entered into two nondisclosure agreements with AAC in which L&P agreed to use such information only in consideration of the acquisition and not in its business otherwise.  As early as May 2001, AAC showed L&P two prototype gusset ruffler machines.  On February 1, 2002, L&P broke off negotiations with AAC.  Also in early 2002, Sealy decided not to purchase AAC's gusset ruffler machines.  As a result, on March 5, 2002, AAC filed a patent application for the gusset ruffler machine it developed, which ultimately issued as U.S. Patent No. 6,834,603 ("the '603 Patent") on December 28, 2004.  Also due to Sealy's decision not to buy the machines, AAC began displaying its gusset ruffler machine at a trade show in Denver in March 2002.  L&P displayed a gusset ruffler ("GPT Gusset Ruffler" or "GPT Ruffler") machine at this trade show as well.  L&P has since sold three different GPT Gusset Ruffler models, the GPT-1000E, the GPT-1000AP, and the GPT-1000. AAC claims that an L&P employee at the trade show said that L&P had designed the GPT Gusset Ruffler only in the two or three weeks before the show, while L&P claims that it began design in the summer of 2001.  AAC believes that L&P abused its confidential access to AAC's prototype gusset ruffler machines in designing the GPT Gusset Rufflers, but L&P maintains that it independently developed the GPT Gusset Rufflers based on customer demand.

3

In 2004, before the '603 Patent issued, AAC allegedly made statements to customers of L&P regarding an upcoming patent that would prevent L&P from selling its GPT Rufflers. AAC denied this claim. AAC was assigned the '815 Patent by Sealy shortly before filing the instant lawsuit on April 22, 2005.

II.  Defendant's Motion to Exclude the Expert Report and Testimony of Dale Lischer

The qualification of an expert witness and the admissibility of evidence are preliminary questions decided by the district court.  Fed. R. Evid. 104(a).  Because the issue of expert testimony is procedural and not unique to patent law, the law of the regional circuit, as opposed to the law of the Federal Circuit, governs this type of motion.  Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1276 (Fed. Cir. 1999).  The burden is on the proponent of the expert testimony to show its admissibility by a preponderance of the evidence.  Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999).  The decision is then within the Court's discretion and is reviewed under an abuse of discretion standard.  Id.  Such analysis applies to this and the subsequent motion.

A. Qualifications

Federal Rule of Evidence 702 allows expert testimony from a witness "qualified as an expert by knowledge, skill, experience, training, or education." Mr. Lischer graduated from University of Michigan Law School in 1972 and has been practicing law for the past 23 years, focusing primarily on patent litigation.  He has also prosecuted patents and served as an expert witness in many

4

other patent cases.  Currently, Mr. Lischer is the Chair of the Intellectual Property Department at a law firm in Atlanta, Georgia.  Mr. Lischer clearly has the requisite level of knowledge, skill, experience, training, and education to testify as an expert on patent law generally.  Although Mr. Lischer's Bachelors degree is in electrical engineering, his experiences prosecuting patents, litigating, and testifying as an expert involve an extremely broad range of technologies, including many mechanical devices.  The Court finds Mr. Lischer's education and experience sufficiently broad to encompass the technology at issue and qualify him as an expert for this case.

Based on his report, the subject and method of Mr. Lischer's testimony also meet the requirements in Rule 702 and Daubert.  509 U.S. at 597.  Under Daubert, the Court must determine whether the expert's testimony "both rests on a reliable foundation and is relevant to the task at hand."  Id.  The subject matter of Mr. Lischer's proposed testimony is relevant to this case because it covers many of the issues to be decided by the jury.  As for reliability, given the non-scientific nature of the inquiry, Mr. Lischer's testimony need not be subjected to scientific standards. Rather, the appropriate inquiry relates to his professional experience.  See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999) (discussing Daubert's gatekeeping requirement and stating that "[i]n other [non-scientific] cases, the relevant reliability concerns may focus upon personal knowledge or experience"); Fed. R. Evid. 702, Advisory Committee Note (2000) ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.").  As discussed above, Mr. Lischer

has sufficient professional experience to give reliable testimony regarding patent law and his opinion on invalidity.

Thus, the Court will not exclude Mr. Lischer's testimony on the ground that he is unqualified as an expert. Nevertheless, an expert witness's credibility is for the jury to decide, and Plaintiff can use cross-examination to expose any doubt it has concerning Mr. Lischer's expertise in the patented technology. See Daubert v. Merrell Dow Pharms., 509 U.S. 579, 596 (1983) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### B. Admissibility of Particular Testimony

Notwithstanding his qualification as an expert, Mr. Lischer will not be permitted to testify as to all of the matters stated in his expert report because some are not within the proper scope of expert testimony. Specifically, some of Mr. Lischer's proposed testimony usurps the Court's role of instructing the jury on the applicable law. See, e.g., United States v. Leo, 941 F.2d 181, 196 (3d Cir. 1991) (stating that "it is not permissible for a witness to testify as to the governing law since it is the district court's duty to explain the law to the jury"). Rule 702 governs the admission of expert testimony. It states that qualified expert testimony is admissible when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." The Advisory Committee Notes suggest that the standard incorporates a

common sense inquiry of whether a layman could best decide the issue with help from an expert in the subject matter of the dispute.   Because it is the exclusive role of the court to instruct the jury on the applicable law, it is inappropriate and will not help the jury to have an expert witness testify as to the law.  See Bausch & Lomb, Inc. v. Alcon Labs., Inc., 79 F. Supp. 2d 252, 255 (W.D.N.Y. 2000) (stating that "testimony that is designed to instruct the jury on the applicable law is not admissible because, by purporting to do what lies within the exclusive province of the court, it cannot be helpful to the jury").   That notwithstanding, expert witnesses have been allowed to testify as to many legal and factual matters in patent infringement cases.

Mr. Lischer states in his expert report that he expects to testify concerning 1) the general nature of patents, 2) the parts of a patent and the function each serves, 3) how an applicant obtains a patent, including the disclosure obligations, 4) the requirements for the issuance of a patent, and 5) the rights a patent gives the patentee.   The Court will address each type of subject matter in turn.

1) Mr. Lischer may testify as to the nature of patents and the policy underlying the patent system.   Such testimony will provide background information that could assist the jury to understand the evidence or determine facts in issue.   Under a common-sense inquiry, a jury of laymen will be better equipped to understand patent evidence and decide patent issues after learning about the patent system.   And importantly, testifying as to the nature of patents will not usurp or conflict with any of the Court's instruction on the governing law.

7

2) Like testimony concerning the nature of patents, testimony concerning the parts of a patent and their functions will provide helpful background information for understanding the evidence and, in turn, determining facts in issue.   Such testimony is admissible.

3) Testimony regarding the procedural aspects of obtaining a patent is admissible, but testimony regarding an applicant's disclosure obligations is not. Experts commonly testify as to the procedure of obtaining a patent. See, e.g., id. at 255 (stating that testimony regarding the general procedure of the patent application process may be helpful to the jury and is admissible). Again, this is background information that will help the jury understand evidence and decide facts in issue.   Explaining the disclosure obligations, however, is a backdoor way of instructing the jury on the law of inequitable conduct.   Indeed, Mr. Lischer's report contains an Inequitable Conduct section that is instructive in nature and not specific to this case, quoting statutes and citing statements of the law.   This type of testimony is prohibited, as the Court has the duty to instruct the jury on the applicable law and will do so.   The applicable law includes the duty of disclosure and the inequitable conduct standards for materiality and intent.   "The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury." Torres v. County of Oakland, 758 F.2d 147, 150 (6th Cir. 1985).   While Mr. Lischer may not provide the law or legal conclusions, he may give his opinion on inequitable conduct based on the facts, as he does later in his report.   See United States v. Bilzerian, 926 F.2d

1285, 1294 (2d Cir. 1991) ("[A]lthough an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts."). There is a fine line between the two, which often depends on the phrasing and context of the questions and answers. See Bausch & Lomb, Inc., 79 F. Supp. 2d at 258. The Advisory Committee Notes to Rule 704, which allows opinions that embrace an ultimate issue, explain the line further:

> These provisions [Rules 701, 702 and 403] afford ample assurances against the admission of opinions which would merely tell the jury what result to reach . . . They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria. Thus, the question, 'Did T have capacity to make a will?' would be excluded, while the question, 'Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?' would be allowed.

Thus, expert testimony should be excluded when it contains terms with a separate legal meaning, as opposed to when a layman would understand the terms and their meaning. See Torres, 758 F.2d at 151. As applied to this case, Mr. Lischer may compare the patented technology to the nondisclosed references and explain his opinion that the references would be relevant to a reasonable patent examiner, but may not state plainly that the references are material. Similarly, he may discuss the facts involved in an intent determination, but he may not state that there was intent. Also, Mr. Lischer may testify regarding the meaning of claim language, but may not suggest the claims' proper legal construction because claim construction is decided by the Court as a matter of law. As context is important to determine the intent and effect of a witness's testimony, the Court will rule more

specifically on the scope of Mr. Lischer's testimony in response to objections at trial.   See id.

4) Testimony concerning the requirements for the issuance of a patent is designed to instruct the jury on the applicable law. See, e.g., id. (stating that testimony concerning the requirements for patentability "is clearly calculated to invade the province of the court to determine the applicable law and to instruct the jury as to that law"); EZ Dock, Inc. v. Schafer Sys., Inc., 2003 U.S. Dist. LEXIS 3634, at *28 (D. Minn. Mar. 8, 2003) ("The Court rejects Defendants argument that [the expert's] 'specialized knowledge' as a patent attorney will help the jury understand the various statutory requirements . . . and the duties of an applicant in the patenting process.  These are issues of law on which the Court will instruct the jury.").   Specifying the requirements for a valid patent is a backdoor way of explaining the law on various grounds for invalidity and is impermissible.

5) Similarly, explaining the rights encompassed by a patent is essentially like instructing the jury on the law of infringement. While instructing on what a patent prohibits others from doing impinges on the Court's duty, analyzing infringement within a particular set of facts can be proper expert testimony.  There is no indication in the expert report, however, that Mr. Lischer is planning to give an infringement opinion.

Thus, Mr. Lischer will be allowed to testify as detailed above, and the Court will make further rulings as necessary at trial.  Further, only the portions of Mr. Lischer's expert report found to be permissible will be considered by the Court for purposes of the instant motion for preliminary injunction.

Defendant's Motion to Exclude the Expert Report and Testimony of Dale Lischer is GRANTED IN PART and DENIED IN PART.

III. <u>Plaintiff's Motion to Exclude the Expert Declaration and Testimony of Thomas Sanfilippo</u>

Plaintiff argues that Thomas Sanfilippo's declaration and testimony should be excluded on the grounds that he is unqualified as an expert witness and alternatively, that his declaration does not meet the requirement in Federal Rule of Civil Procedure 26(a)(2)(B) that Defendant submit a report "prepared" by its expert witness.

A. <u>Qualifications</u>

As stated above, Rule 702 allows expert testimony from a witness "qualified as an expert by knowledge, skill, experience, training, or education."  The deposition testimony of Thomas Sanfilippo sheds light on his qualifications.  He worked at Serta for 11 years and was Vice President of Manufacturing at the time he retired in 2004.  In this position, Mr. Sanfilippo went to multiple-source sleep shop retailers to compare products, kept up with new developments in the bedding industry, visited bedding shows to get upgraded manufacturing equipment for the plants, oversaw the manufacture of machine prototypes, and was involved with the manufacture of pillowtop mattresses.  In fact, Mr. Sanfilippo had noticed problems with the manufacture of pillowtop mattresses and had suggested an automated system while at Serta. Given Mr. Sanfilippo's experience at Serta, he is familiar with bedding machinery and products and has expertise in comparing

11

different types of bedding machinery and products that could assist a jury.

Although it is a close call, the subject and method of Mr. Sanfilippo's testimony also meet the requirements in Rule 702 and Daubert. The Court's inquiry is whether the expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597. The relevance inquiry is simple, as Mr. Sanfilippo plans to give his opinion whether Plaintiff's patents were infringed, and this is the central charge of Plaintiff's complaint. The reliability inquiry is more complex. Given that Mr. Sanfilippo's testimony involves no testable scientific method, but rather just an informed comparison of technology to patent claims, the relevant inquiry is his professional experience. See Kumho Tire Co., 526 U.S. at 150. Indeed, Mr. Sanfilippo has significant experience comparing bedding machinery and products and seems qualified to do so here. Plaintiff highlights the fact that Mr. Sanfilippo has not read the patents at issue. As Defendant points out, Mr. Sanfilippo will not testify as to claim construction, which is decided by the Court; rather, he will answer questions based on hypothetical claim constructions presented to him. Plaintiff also attacks his lack of exposure to the GPT-1000 series. Mr. Sanfilippo stated that viewing the video of the GPT-1000 machine was effectively the same as seeing it operated in person, and he was able to describe its operation, aside from a few details that he missed. Finally, Plaintiff shows that Mr. Sanfilippo does not know the meaning of most patent law terms. While such a background would help him understand the implications of his opinions, patent law knowledge

12

is not required of a technology expert.  He must be able to grasp
the meaning of the standards supplied to him in questions, but he
does not need to know or use the corresponding legal terms.  In
fact, in rendering his opinions as an expert, Mr. Sanfilippo must
avoid terms with a separate legal meaning and use terms that a
layman would understand.  <u>See</u> <u>Torres</u>, 758 F.2d at 151.  It is
clear from Mr. Sanfilippo's deposition that he is familiar with
the prior art, familiar with developments in the art over the
years, familiar with the technology in question, and able to
understand the standards that he is to apply.  Moreover, Mr.
Sanfilippo's deposition demonstrates that he is honest about what
assumptions he is working under and what he does and does not
know.  Thus, the Court concludes that Mr. Sanfilippo's
deficiencies should go to the weight, rather than admissibility,
of his testimony, and cross-examination will be an effective tool
to expose his level of expertise and let the jury determine his
credibility.  Given that Mr. Sanfilippo's testimony need not be
excluded for lack of qualification, the Court next addresses
whether it needs to be excluded for violating Rule 26.

B. <u>Compliance of Expert Declaration with Rule 26(a)(2)(B)</u>

Rule 26(a)(2)(B) requires that expert testimony be
accompanied by a report "prepared and signed by" the expert.[1]  The
Advisory Committee Notes state that "Rule 26(a)(2)(B) does not
preclude counsel from providing assistance to experts in preparing

---

[1]The Court notes that Mr. Sanfilippo's expert report is
labeled a declaration, but it otherwise appears to be an expert
report and will be treated as such.

the reports. . . . Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and it must be signed by the witness." Mr. Sanfilippo admitted that his declaration was drafted by Defendant's attorney after their second telephone conversation. After their first telephone conversation, Mr. Sanfilippo spent about two hours reviewing materials he was sent. He then had about a ninety minute conversation with Defendant's attorney, in which Mr. Sanfilippo answered questions about the issues in the case. Shortly after this conversation, Mr. Sanfilippo received a draft declaration. Mr. Sanfilippo then reviewed the draft and made minor changes before signing the final copy. Having the expert consult with the attorney, read and edit the attorney's draft, and affirm that it reflects his opinions is sufficient to count as "prepared" under Rule 26 case law. In the cases in which an expert report was excluded, the court found no evidence that the expert was involved in preparation. See Stein v. Foamex Int'l, Inc., 2001 U.S. Dist. LEXIS 12211, at *16-17 (E.D. Pa. Aug. 15, 2001) (finding that the expert never claimed any role other than signing the report, and that the report used explicit statutory language that the expert did not understand); In re Jackson, 2000 U.S. Dist. LEXIS 1318, at *3 (D. Mich. Feb. 8, 2000) (finding that substantial similarities between the expert's report and another report prepared by the same attorney for another case indicate that the attorney exceeded the legitimate bounds of assistance). On the other hand, courts have accepted expert reports when the expert was involved enough that the report reflects the expert's

14

opinions, even when it was drafted by an attorney.  See Crowley v. Chait, 322 F. Supp. 2d 530, 544 (D. N.J. 2004) (finding that the expert offered substantial input by meeting with the attorney to review documents and giving an interview ); Isom v. Howmedica, Inc., 2002 U.S. Dist. LEXIS 9116, at *2-3 (N.D. Ill. May 22, 2002) (allowing the report despite the fact that the attorney wrote it because the expert was sufficiently involved in the preparation and revision that it may be considered to set forth his opinions); Clintec Nutrition Co. v. Baxa Corp., 1998 U.S. Dist. LEXIS 13541, at *18 (N.D. Ill. Aug. 26, 1998) (allowing the report despite the fact that it was prepared with the attorney and contained verbatim sections from an opinion letter written by the attorney, and stating that these facts can be brought out on cross-examination). The circumstances of Mr. Sanfilippo's report resemble more closely those when the expert report was allowed.  Although there is some similarity to Stein because Mr. Sanfilippo does not understand the legal terms, his declaration does not use the terms as if they were his own.  Instead, his declaration prefaces definitions and standards with language such as, "I have been informed that" or "it is my understanding that," which reflects Mr. Sanfilippo's knowledge pretty accurately.  In Isom, the expert participated by reviewing materials, having extensive discussions with the attorney who drafted the report, then revising it before signing it.  This level of participation is comparable to that of Mr. Sanfilippo, who reviewed materials and spoke with Defendant's attorney for ninety minutes, answering questions about his opinions on the issues, then received and read a draft that was based on their conversation.  Based on his deposition, the

declaration reflects the testimony Mr. Sanfilippo intends to give, and it satisfies the "prepared by" requirement of Rule 26. Thus, the Court DENIES Plaintiff's Motion to Exclude the Expert Declaration and Testimony of Thomas Sanfilippo.

IV. Defendant's Motion to Strike the Supplemental Declaration of Ben Kuchel

The Patent Local Rules establish the procedures for parties to follow in patent infringement actions in this Court. Per Patent Local Rule 6.3, the parties filed a joint claim construction statement with each party's proposed construction of the disputed terms. Per Rule 6.5(a), each party then filed an opening brief, along with evidence supporting the proposed claim construction. Parts of the proposed construction in Plaintiff's opening brief differed from its proposed construction in the joint claim construction statement. Per Rule 6.5(b), each party then filed a responsive brief to the opposing party's opening brief. Plaintiff filed the Supplemental Declaration of Ben Kuchel as an exhibit to its responsive brief. (The original Kuchel Declaration was filed by Plaintiff with its Motion for Preliminary Injunction.)

Rule 6.5(b) provides that a party shall file supporting evidence both with its opening brief and with its responsive brief. Because the language of the rule is at issue, it is reprinted below:

> 6.5 Claim Construction Briefs
> (a) Not later than thirty (30) days after serving and filing the Joint Claim Construction Statement, each party shall serve and file an opening brief and any evidence supporting its claim construction.

16

> (b) Not later than twenty (20) days after service upon it of an opening brief, each party shall serve and file its responsive brief and supporting evidence.

The Supplemental Kuchel Declaration could not have been written in its entirety and filed with Plaintiff's opening brief because part of it responds to Defendant's opening brief. While part of the Supplemental Kuchel Declaration is in support of Plaintiff's own opening brief, Defendant gives no support for its contention that this violates Rule 6.5.

Also, the Court finds that Defendant was not unfairly prejudiced by the timing of the Supplemental Kuchel Declaration. Defendant claims that it was prejudiced by not having the Supplemental Kuchel Declaration at the time it filed its responsive brief, but Defendant has now had the opportunity to respond fully to the Supplemental Kuchel Declaration elsewhere. Specifically, Defendant deposed Kuchel four days after his Supplemental Declaration was filed, and six days later addressed his Supplemental Declaration in its Opposition to Plaintiff's Motion for Preliminary Injunction. Furthermore, by providing that a party shall file supporting evidence with its responsive brief, Rule 6.5(b) contemplates that a party may submit evidence that the other party will not be able to address in its responsive brief. The Court in its discretion DENIES Defendant's Motion to Strike the Supplemental Declaration of Ben Kuchel.

V.   <u>Plaintiff's Motions for Preliminary Injunction and Expedited Hearing</u>[2]

Federal Circuit law generally governs the issuance of preliminary injunctions under 35 U.S.C. § 283. <u>Hybritech, Inc. v. Abbott Labs.</u>, 849 F.2d 1446, 1451 n. 12 (Fed. Cir. 1988). However, regional circuit law governs purely procedural questions involving the issuance of preliminary injunctions. <u>Id.</u>

As the moving party, Plaintiff has the burden of showing entitlement to a preliminary injunction. <u>Reebock Int'l v. J. Baker, Inc.</u>, 32 F.3d 1552, 1555 (Fed. Cir. 1994). The Federal Circuit considers the following four factors to determine whether the moving party in a patent infringement case has proven its right to a preliminary injunction: "1) a reasonable likelihood of success on the merits; 2) irreparable harm; 3) the balance of hardships tipping in favor of the requesting party; and 4) that the issuance of an injunction is in the public interest." <u>Chrysler Motors Corp. v. Auto Body Panels, Inc.</u>, 908 F.2d 951, 953 (Fed. Cir. 1990). No one factor is dispositive. <u>Id.</u> The grant of a preliminary injunction requires analysis of all four factors, but a court may deny a preliminary injunction based on the absence of one factor, especially one of the first two, without analysis of the others. <u>Id.</u> It is within the district court's discretion to grant or deny a preliminary injunction, and such decision is reviewed under an abuse of discretion standard. <u>Genentech, Inc. v. Novo Nordisk A/S</u>, 108 F.3d 1361, 1364 (Fed. Cir. 1997).

---

[2]The Court exercises its discretion to consider Defendant's sur-reply brief in deciding this motion, and hereby GRANTS Defendant's Motion to File Sur-Reply Brief NUNC PRO TUNC.

A. <u>Likelihood of Success on the Merits</u>

"[A]t the preliminary injunction stage, because of the extraordinary nature of the relief, the patentee carries the burden of showing likelihood of success on the merits with respect to the patent's validity, enforceability, and infringement." <u>Nutrition 21 v. United States</u>, 930 F.2d 867, 869 (Fed. Cir. 1991). Specifically, the patentee must show, in light of the burdens applicable at trial, that the accused party likely infringes the patent and that the infringement claim will likely withstand challenges to the patent's validity and enforceability. <u>Genentech</u>, 108 F.3d at 1364.  If the accused party raises a defense of invalidity, unenforceability, or noninfringement that the movant cannot show lacks substantial merit, then a preliminary injunction is improper.  <u>Id.</u>

1.  <u>Infringement</u>

A likelihood of infringement analysis involves two steps. The first step is construing the scope and meaning of the patent claims.  <u>Oakley, Inc. v. Sunglass Hut Int'l</u>, 316 F.3d 1331, 1339 (Fed. Cir. 2003).  The second step is comparing the construed patent claims to the allegedly infringing device.  <u>Id.</u>

Claim construction is decided by the Court as a matter of law.  <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 979 (Fed. Cir. 1995). The Court is not required to make a final determination about claim construction at the preliminary injunction stage, and thus declines to do so.  <u>See</u> <u>Sofamor Danek Group, Inc. v. Depuy-Motech, Inc.</u>, 74 F.3d 1216, 1221 (Fed. Cir.

1996).  Final claim construction will be more appropriate after a detailed examination of the parties' complete arguments, especially given that the proposed claim constructions have evolved since this case began.  Thus, the constructions in this Order will not bind the Court at the summary judgment stage.

In construing patent claims, the Court looks first to the words of the claims, both asserted and unasserted, to determine their scope.  Vitronics Corp. v. Conceptronics, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  "[A]s a general rule, all terms in a patent claim are to be given their plain, ordinary and accustomed meaning to one of ordinary skill in the relevant art." Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001).  Also, the Court notes that the parties agreed in their Joint Claim Construction Statement that "the terms, phrases and clauses of the '815 and '603 Patents need no construction, and should be afforded their ordinary meaning except as otherwise stated" therein.  Although some of the proposed constructions have changed since the Joint Statement, many of the elements are undisputed and will not be construed.  For disputed terms, once an ordinary meaning is ascertained, the court should confirm that the patentee's use of the term in the specification is consistent with the ordinary meaning.  Id.  This is important because the ordinary meaning does not control if the patentee has chosen to be his own lexicographer, and rarely controls if it excludes the preferred embodiment.  Id.  Only when the patent and prosecution history leave the claims unclear should extrinsic evidence be consulted. Vitronics Corp., 90 F.3d at 1582.  An exception is that dictionaries do not count as extrinsic evidence and may be

20

consulted by the court at any time, including to determine the ordinary meaning of claim language to one of skill in the art. Tex. Dig. Sys. v. Telegenix, Inc., 308 F.3d 1193, 1202 (Fed. Cir. 2002).

Once the claims are construed and ready for comparison, infringement is an issue of fact. Southwall Techs. v. Cardinal IG Co., 54 F.3d 1570, 1575 (Fed. Cir. 1995). Literal infringement requires that each and every element of the patent claim is present in the accused device. Id.

### a.  Construction of Claim 32 of the '603 Patent

Defendant argues that the elements "gusset forming station," "pleat generator," and "system controller" should be construed in means-plus-function format. Because the claims at issue do not use "means for" language, there is a strong presumption against the means-plus-function format. Lighting World, Inc., 382 F.3d at 1358. Defendant bears the burden of rebutting such presumption by a preponderance of the evidence.  See Apex Inc. v. Raritan Computer, Inc., 325 F.3d 1364, 1372 (Fed. Cir. 2003). Defendant relies primarily on one unusual case to support its argument that the claims should be construed in means-plus-function format.  In Mas-Hamilton, the Federal Circuit affirmed the district court's construction of "movable link member" and "lever moving element" in means-plus-function format.  The Federal Circuit recently discussed Mas-Hamilton in another case as support for the proposition that a claim without "means for" language will only rarely be construed in means-plus-function format.    Lighting World, Inc. v. Birchwood Lighting, Inc., 382 F.3d 1354, 1362 (Fed.

Cir. 2004) (noting that Mas-Hamilton is the first published case since 1996 in which the Federal Circuit has upheld construction in means-plus-function format for a claim without "means for" language). Unlike devices that take their name from the functions they perform, "element" and "member" are generic terms that are interchangeable with "means," and these terms had, in fact, been used interchangeably with "means" in the patent at issue. Id. at 1360-1363.

To avoid means-plus-function construction, the term must be "one that is understood to describe structure, as opposed to a term that is . . . not recognized as the name of structure and is simply a substitute for the term 'means for.'" Lighting World, Inc., 382 F.3d at 1360. The inquiry does not revolve around the term alone, however; it is error for the district court to look at the term alone, rather than at the claim limitation as a whole. Apex Inc., 325 F.3d at 1373. The appropriate inquiry is "whether the term itself connotes sufficient structure to one of ordinary skill in the art to perform the functions identified by each limitation." See id. at 1372. To help determine whether a term has a structural meaning, the Federal Circuit has "looked to the dictionary to determine if a disputed term has achieved recognition as a noun denoting structure" and has looked at whether the patent itself uses the term to describe structure. Lighting World, Inc., 382 F.3d at 1360-61.

Here, the evidence supports Plaintiff's position that "station," "generator," and "controller" are not merely substitutes for "means for" language. First, the terms at issue are not generic like the terms in Mas-Hamilton. "Generator" and

22

"controller" are devices that take their name from the function they perform, and "station" does not deal with function or means at all.

The parties agreed on the definition of "station" as "any place in a manufacturing operation where work is done." This indicates structure above function, as the station is the place where the function is performed. Despite that "gusset forming station" was not used in the specification of the patent, the limitation would have sufficient structural meaning to one of skill in the art to form a gusset from a strip of gusset material, although it does not have just one structural meaning. Indeed, an embodiment of a "gusset forming station" in Claim 36 includes a few devices. Defendant has not presented sufficient evidence to meet its burden of showing that, to one of ordinary skill in the art, the term does not connote sufficient structure to perform the recited function.

Likewise, "pleat generator" would have structural meaning to one of skill in the art "for forming at least one pleat in the gusset at a desired location about the panel." Plaintiff's expert Ben Kuchel indicates in his declaration a number of devices that one of skill in the art would understand to be pleat generators. Mr. Marcangelo also referred to a part of the GPT Ruffler as a "pleat generator" in the inspection video. Importantly, the '603 Patent uses the term "pleat generator" in the specification. Specifically, "pleat generator" is used to refer to the structural device also called the "ruffler 318" in Figures 3, 4 and 9. This, in addition to the lack of "means for" language, is persuasive

23

evidence that Plaintiff did not intend to invoke means-plus-function format.

"Controller" is "one that controls," or "a regulating mechanism." In the context of the '603 Patent, "system controller controlling a sewing operation" would indicate a number of possible devices to one of skill in the art, such as Plaintiff's expert Ben Kuchel. Specifically, he indicated that "a system controller controlling a sewing operation" that "can control the sewing of the gusset to the panel at varying rates to enable high speed sewing of the gusset to the panel and sewing at a different rate for generation of the pleats in the gusset as needed" could be computer software or an optical detection device, among other possibilities. Defendant has not presented sufficient contrary evidence to overcome the presumption against means-plus-function construction.

Given that Defendant has not met its burden of overcoming the strong presumption against means-plus-function construction in the absence of "means for" language, all elements of Claim 32 of the '603 Patent will be construed normally.

In element (a) and throughout the Patents, the parties agree that "gusset" means "an intermediate fabric material used to join two other components." The parties dispute the meaning of "formed" as used in element (a). Claim 36, which depends from Claim 32, describes an embodiment of a "gusset forming station" that includes an accumulator, a folder, and a sewing machine. This embodiment does not limit Claim 32, as "limitations stated in dependent claims are not to be read into the independent claim from which they depend." Nazomi Comms., Inc. v. Arm Holdings,

PLC, 403 F.3d 1364, 1370 (Fed. Cir. 2005). Thus, although "gusset forming station," and "forming" in particular, have the same meaning in Claims 32 and 36, Claim 32 could be infringed by embodiments other than that in Claim 36, due to its broader wording. See id. The ordinary meaning of "forming" is "to give form to." The Court next looks to the specification to construe the meaning of "forming" as used in this element. Defendants argue that "forming" is used synonymously with "folding" several times in the specification, and thus that "forming" must include "folding." However, the specification does not indicate any intent to so limit the meaning. Although the gusset is formed by being folded in preferred embodiments, nowhere is "forming" defined to include folding. Also, a "gusset folder" is used in the specification as the device that folds the gusset, and Claim 32 makes clear that a "gusset folder" is not synonymous with a "gusset forming station." The Court finds, given its use in Claim 36 and elsewhere in the specification, that "forming" is used to mean "organizing or arranging," consistent with a dictionary definition of "form" as "to organize or arrange." That is, the gusset forming station automatically arranges a gusset from a strip of gusset material to prepare it for attachment to the panel. The specification states, "[i]n another aspect, the invention is a gusset for attachment to a panel." It also states, "in one aspect, [it] is an apparatus for attaching a gusset to a panel that includes a gusset folder that receives and folds a gusset material to form the gusset for attachment to the panel." The specification thereby suggests that a strip of gusset material is arranged (formed) to become a gusset before attachment to the

25

panel.  Such arrangement may include, but is not limited to, folding it, accumulating it, and sewing it to a flange, as disclosed.

The Court rejects Plaintiff's proposed construction that "gusset forming station" includes a gusset guide.  The specification mentions a gusset guide that "guides the gusset fed to the sewing machine . . ."  The gusset guide operates on an already-existing gusset, rather than on gusset material, as the gusset forming station is described to do.  Once the gusset is formed from the strip of gusset material, the gusset forming station is no longer involved.  This is consistent with the use of "gusset forming station" in Claims 32, 36 and 37 (the only uses of this phrase in the Patent), which specify that it is acting on the gusset material.  By contrast, in the specification the gusset guide guides the gusset.  The Court notes that this is inconsistent with Mr. Dasher's deposition statement that there is not a gusset until the gusset material is sewn to the panel, but consideration of such extrinsic evidence is improper here because the meaning is discernible from the intrinsic evidence.  Finally, given the ordinary meaning of "automatic" as "acting or operating in a manner essentially independent of external influence or control," the gusset forming station forms the gusset essentially independent of operator intervention.  Thus, the Court construes element (a) as "a place where a strip of gusset material is arranged for attachment to the panel essentially independent of operator intervention."

Elements (b) and (c) require no construction, except for the term "panel," and will otherwise be afforded their ordinary

meaning, as agreed upon in the Joint Claim Construction Statement. The parties agree that "panel" means "cut-to-size layer of fabric used on the outside or inside of a mattress defining generally planar surfaces." Thus, as claimed, element (b) is "a sewing table having an upper surface supporting the panel as the gusset is attached thereto." As claimed, element (c) is "a sewing machine adjacent to the upper surface of the sewing table, positioned along sewing path for the panel, for attaching the gusset to the panel."

According to its ordinary meaning, a "pleat generator" is simply a "device that generates a pleat." Plaintiff attempts to read in the limitation that the pleat generator is independent of the sewing machine, but this is unsupported by the language of the claim or the specification. The pleat generator is said to be independent of the drive belt, which advances the panel and gusset through the sewing machine, but there is no indication of the pleat generator's relationship to the sewing machine other than that they are "in timed relation." Although the Court thinks this phrase has a clear ordinary meaning, the Court adopts a definition of "in timed relation" originally stated by Plaintiff and agreed to by Defendant: "in an operation timed with the sewing machine." The Court cannot accept Plaintiff's interpretation of "desired location" as "location chosen by the system," as this is not its ordinary meaning. In context, a "desired location" is simply a location where a pleat is wanted. Finally, the Court adopts the dictionary definition of "pleat" as "a fold in cloth made by doubling the material upon itself and then pressing or stitching the fold into place." This is consistent with the term's use in

the specification; for example, Figure 2 describes pleats (also called ruffles) being stitched into the gusset. The Court rejects Plaintiff's extra limitation of "presenting a nice appearance" because it is not part of the ordinary meaning and is not made clear in the specification, and even Plaintiff's expert does not explain the source. Thus, the Court construes element (d) as "a device that generates a pleat in the gusset at a location about the panel where a pleat is wanted, in an operation timed with said sewing machine, sewing the gusset to the panel."

For element (e), the Court adopts the construction of "system controller" agreed upon by the parties: "any electrical or mechanical element or group of elements that controls." As for the rest of the element, the Court will afford it the ordinary meaning as written. A dictionary definition of "control" is "to exercise authoritative or dominating influence over; direct." Although operator intervention seems inconsistent with the ordinary meaning that the controller is what is directing the sewing to proceed at varying rates, the Court rejects Plaintiff's proposed addition of the limitation "without operator intervention" because the claim language speaks for itself. Thus, element (e) is "any electrical or mechanical element or group of elements that controls a sewing operation for attaching a gusset to the panel, wherein said element(s) can control the sewing of the gusset to the panel at varying rates, to enable high speed sewing of the gusset to the panel and sewing at a different rate for generation of the pleats in the gusset as needed."

28

b.   Comparison of Construed Claim 32 with Accused Device

Claim 32 having been construed, the Court now compares the Claim to Defendant's accused GPT Gusset Rufflers.   Because Plaintiff does not argue infringement under the doctrine of equivalents in its pleadings, the Court will address only literal infringement in this Order.

Further, because the parties do not dispute that elements (b) and (c) are present in Defendant's GPT Rufflers, the Court assumes that Plaintiff will successfully prove the presence of these elements at trial and does not discuss them here.   Defendant contends that elements (a), (d), and (e) are not present in its GPT Rufflers.   The Court will look at each of these in turn.

Element (a) - The GPT Rufflers do not contain a folder, or, to the Court's knowledge, an accumulator or a sewing machine to make a flanged gusset, the three components of a "gusset forming station" in Claim 36.   The GPT Rufflers do have an edge guide that guides the gusset to the sewing head without operator intervention.   As construed, this element is not infringed by the presence of an edge guide because guiding the "already-formed" gusset is not part of the claimed "gusset forming station."   As shown in the GPT inspection video, the GPT Rufflers also contain a gusset pull-out device that holds the gusset material between the spool and the edge guide.   Although the pull-out device does not have the same measuring function as the accumulator, it likely would be found to fall within the scope of "arranging" the strip of gusset material.   Defendant claims that an operator has to be present to guide the gusset material for it to feed correctly, and

thus that the "automatically" requirement is not met, but the GPT inspection video shows the machine operating without any operator assistance to guide the gusset material. Thus, Plaintiff has shown a likelihood that it will prove this element's presence in the GPT Rufflers at trial.

Element (d)- The GPT Rufflers have a device that generates pleats in the gusset. In the GPT inspection video, Mr. Marcangelo even referred to a specific device as a "pleat generator." The number and spacing of the pleats, and thus their location, are determined by setting parameters of the machine prior to operation. The parameters can be set to create pleats at locations where pleats are wanted, and thus this aspect of the element is present. Defendant claims that the operator determines the locations of the pleats because the operator manually turns the panel. However, this does not change the fact that the pleats are being placed at desired locations, and there is no requirement of automaticity in this element. Defendant's argument regarding the timed relation aspect is confusing. Mr. Marcangelo stated first that the sewing needle is not synchronized with the ruffler blade, but later stated that the machines have a synchronizer which times the relationship between sewing and generating pleats. The GPT Rufflers sew multiple pleats consecutively without operator intervention in square corner mode, which involves generating a pleat, stitching between pleats, and generating another pleat. Thus, the pleat generator's operation is presumably timed with the sewing machine. Plaintiff has shown a likelihood of success for proving that this element is present in the GPT Rufflers.

Element (e)– The GPT Rufflers contain a two-sensor system for altering the speed of the sensor. In round corner mode, the sensors cause the speed to slow, then to stop after a pleat is formed, and the operator has to push a foot pedal before the next pleat will be formed. Also, the operator has to manually rotate the panel as the pleats are being sewn. In square corner mode, multiple pleats are formed without operator intervention before the sewing stops and the operator manually rotates the panel. Because the sensors themselves control the varying speeds and the operator's intervention functions merely to restart sewing, it seems likely that the sensors qualify as a "system controller," as claimed. Plaintiff has shown a likelihood that it will prove this element's presence in the GPT Rufflers at trial.

Given that Plaintiff has shown a likelihood of proving that each element of Claim 32 is present in Defendant's GPT Rufflers, Plaintiff has shown a likelihood of success in proving that the '603 Patent is being infringed by Defendant.

c. Construction of Claim 11 of the '815 Patent

As with the '603 Patent, the parties agreed in their Joint Claim Construction Statement on the meanings of some terms used in the '815 Patent. The parties also agreed that the rest of the terms require no construction and should be afforded their ordinary meaning. Per the parties' definitions, a "gusset" is "an intermediate fabric material used to join two other components" and a "panel" is "a cut-to-size layer of fabric used on the outside or inside of a mattress defining generally planar surfaces." Only the terms "pleat" and "ruffled gusset corner" are

31

disputed. "Pleat" has the same meaning as the Court construed in the '603 Patent: "a fold in cloth made by doubling the material upon itself and then pressing or stitching the fold into place." The specification leads to the meaning of "ruffled gusset corner." The specification states that, "[w]hen formed in series about the radiused corner, the pleats are collectively referred to as a ruffle, or ruffled corner." Also, the gusset corners are described as being "formed as a radial bend." On the other hand, the specification also states that "[t]he invention thus provides a gusset wherein turns, curves or corners of the gusset are ruffled by one or more pleats formed in one edge of the gusset material." This implies that turns, curves and corners of a gusset can be ruffled, which is inconsistent with the above description of a "ruffle" necessarily involving a radiused corner. While "ruffled" is not used to refer only to a radiused corner, the term "corner" itself is used in the specification to refer to a radial bend. The Abstract mentions "the radius of the corners;" the drawing descriptions state that "the corners of the gusset are formed as a radial bend;" and as mentioned above, the specification says that pleats are collectively referred to as a "ruffled corner" "when formed in series about the radiused corner." This is sufficient for the patentee to have acted as its own lexicographer, defining "corner" as a radial bend, rather than using the term for its ordinary meaning, which is not so limited. Thus, the Court construes the final element of Claim 11 as "radiused corners of the gusset having one or more pleats forming a ruffled gusset corner."

32

Although the parties have not disputed the meaning of the term "folded" in Claim 11, the infringement arguments indicate that the parties have interpreted the term differently. Defendant asserts that its ruffled gussets do not meet the "folded about a length dimension" limitation because the GPT Rufflers do not fold the gusset material before attachment to the panel. Mr. Kuchel, on the other hand, contends that mattresses made from the GPT Rufflers meet this limitation because a fold "inherently occurs when the gusset is attached to at least a mattress subpanel and whose corners are ruffled." Mr. Kuchel's interpretation, however, contradicts with Claims 1 and 10- independent Claim 1 covers a "pleated attachment gusset" with both sides attached to panels, and Claim 10 covers "the attachment gusset of claim 1 wherein the gusset material is folded along a length."[3] This indicates that a lengthwise fold, as used in the Patent, is not inherent in the gusset being attached to a panel. Also, the specification states that "the gusset does not have to be in a folded condition when attached to an adjacent layer such as the panel." Elsewhere in the specification it is clear that "folded" is used to refer to the gusset material pre-attachment. The specification describes a "folder" used "to place the gusset material in a folded state along a length of the material" before being guided to the sewing machine. As limitations from the specification are not to be read into the claims, and the language of this element carries its ordinary meaning, the Court finds it unnecessary to impose a

---

[3]Likewise, dependent Claim 23 has the same limitation in relation to independent Claim 21.

construction with altered language.  Nevertheless, the Court notes that the intrinsic evidence leads to an interpretation of "folded" as referring to the gusset material pre-attachment.

Thus, only the final element of Claim 11 has a construction with altered language, as stated above, and the rest of the claim language remains unaltered.

### d. Active Inducement of Infringement of the '815 Patent

Plaintiff alleges that Defendant is actively inducing infringement of the '815 Patent by selling its GPT Rufflers series and encouraging purchasers to use the machines to make mattresses that infringe the '815 Patent.  To prove active inducement of infringement, the patentee must show (1) the existence of direct infringement and (2) "that the alleged infringer knowingly induced infringement and possessed specific intent to induce another's infringement."  MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp., 420 F.3d 1369 (Fed. Cir. 2005).  Thus, an active inducement of infringement analysis involves the same construction and comparison steps as above for literal infringement, plus an additional step comparing Defendant's conduct with the standard for active inducement.

In its motion for preliminary injunction, Plaintiff relies solely on its expert Ben Kuchel to establish direct infringement of Claim 11 of the '815 Patent.  Mr. Kuchel states in his declaration that Claims 11-20 of the Patent are infringed by mattresses incorporating gussets made by the GPT Rufflers, and thus that users of the GPT Rufflers infringe the Patent by making such mattresses.  Mr. Kuchel's declarations, including his claim

34

chart, contain only conclusory statements regarding the presence of the claim elements.  Furthermore, Plaintiff has not presented evidence of any specific incidents of direct infringement by purchasers.  Most in question are the "folded about a length dimension" and "a second edge of the gusset adapted for attachment to another panel" elements.  Because the GPT Rufflers appear capable of both infringing and non-infringing uses, and "direct infringement is a prerequisite to inducing infringement," Fina Research, S.A. v. Baroid Ltd., 141 F.3d 1479, 1484 (Fed. Cir. 1998), it is important to establish that purchasers have, in fact, infringed the '815 Patent.  Thus, Plaintiff has submitted insufficient evidence for the Court to conclude at this point that it will likely prove direct infringement of the '815 Patent at trial.

Mr. Kuchel's declaration is also Plaintiff's primary support for its allegation that L&P affirmatively induces its customers' infringement through statements made in advertisements, brochures, and on the internet.  Courts have found active inducement of infringement when the defendant sells products capable of infringing use, along with providing instructions through brochures or advertisements for the infringing use. See, e.g., 3M v. Chemque, Inc., 303 F.3d 1294, 1305 (Fed. Cir. 2002) (finding inducement when the defendant "supplied the infringing products to T&B and other customers with instructions on how they were to be used, which, when followed, would lead to infringement"); Fromberg, Inc. v. Thornhill, 315 F.2d 407, 412 (5th Cir. 1963) (finding inducement when the defendant "personally demonstrated how that plug could be inserted in an empty Fromberg tube to

35

recreate the original device which he knew to be patented"). "[T]he advertisement must instruct or explain to the purchaser exactly how to recreate or reassemble the product into one that infringes a patent." U.S. Fid. & Guar. Co. v. Star Techs., Inc., 935 F. Supp. 1110, 1116 (D. Or. 1996). Showing "ruffled" dogs and "ruffled" gussets in advertisements does not encourage infringement. Nor does calling the GPT Rufflers "Pillowtop Ruffler Systems," or stating that the GPT Ruffler "[s]ews gusset, attaches inner panel, ruffles corners, and closes." Claim 11 of the '815 Patent does not cover all ruffled gussets; rather, as explained above, literal infringement occurs only when every element of the claim is present in the accused device. As explained above, it is not clear at this point that purchasers are committing infringement, and likewise, Plaintiff has not alleged with sufficient specificity that Defendant's materials instruct or encourage purchasers to use the GPT Rufflers to infringe.

Given that Plaintiff has not shown a likelihood of success of proving direct infringement or active inducement of infringement for Claim 11 of the '815 Patent, it follows that there is no likelihood of success that dependent Claims 12-20 were infringed. See Wahpeton Canvas Co., Inc. v. Frontier, Inc., 870 F.2d 1546, 1553 (Fed. Cir. 1989). Plaintiff has failed to show a likelihood of successfully proving infringement of the '815 Patent at trial.

2. Validity

At the preliminary injunction stage, the Court "does not resolve the validity question, but rather must . . . make an assessment of the persuasiveness of the challenger's evidence,

36

recognizing that it is doing so without all the evidence that may come out at trial." New England Braiding Co. v. A.W. Chesterton Co., 970 F.2d 878, 882-83 (Fed. Cir. 1992). The Court is entitled to find that the movant did not make a sufficient likelihood of success showing where the challenger presents sufficient evidence to raise a "substantial question" of invalidity. Id. at 883.

### a.   On-Sale Bar for the '603 Patent

Section 102(b) of the Patent Act embodies the on-sale bar, negating patentability when "the invention was . . . on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). The term "critical date" is used to refer to the date one year before the patent application was filed.   There are two requirements for the on-sale bar to apply.   First, the product must be the subject of a commercial offer for sale.   Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 67 (1998). Second, the invention must be "ready for patenting."   Id.   That condition may be satisfied in at least two ways: by proof of reduction to practice before the critical date, or by proof that prior to the critical date the inventor had prepared sufficiently specific drawings or other descriptions of the invention to enable a person of skill in the art to practice the invention.   Id. at 67-68.

L&P asserts that the '603 Patent is invalid under 35 U.S.C. § 102(b) because AAC sold three gusset ruffler machines to Sealy more than one year before the filing date. The filing date of the '603 Patent was March 15, 2002, making the critical date March 15, 2001. In its opposition to the motion for preliminary injunction,

L&P specifies the types of machines sold by AAC before March 5, 2001 and supports its assertions with various deposition testimony. AAC argues, in part, that the machines it sold were not ready for patenting and that the sales fall within the experimental use exception to the on-sale bar.

Because the third machine sold is the closest to the current commercial embodiment of the '815 Patent (both are called Model 1335), the Court examines that sale. AAC initially sent Sealy a quotation for the Model 1335 in September of 2000, and the parties agreed upon specifications for the machine that same month. Changes to the model were later made, and the specifications were finalized by February 9, 2001. AAC provided Sealy an invoice for a Model 1335 machine on February 5, 2001, and Sealy paid the invoice. Thus, a commercial offer for sale likely took place before the critical date, satisfying the first prong. AAC argues that the experimental use exception applies to negate this prong, which is discussed below. The Model 1335 was delivered to Sealy on April 10, 2001. Assuming the other requirements are met, this sale/offer for sale is not excused from the on-sale bar by the machine being delivered after the critical date. See STX, LLC v. Brine, Inc., 211 F.3d 588, 590 (Fed. Cir. 2000).

AAC contends that the Model 1335 was not ready for patenting before the critical date. Specifically, AAC contends that the "pleat generator," element (d) of Claim 32, was not present in the Model 1335 sold to Sealy prior to the critical date, because the pleat generator in this machine was still coupled to the sewing operation. AAC points to March 21, 2001 as the date that a prototype including an independent pleat generator was reduced to

38

practice.   However, as construed above, element (d) does not require the pleat generator to be independent of the sewing operation.  Thus, AAC cannot prove that L&P's on-sale bar argument lacks substantial merit by showing that the pleat generator was coupled to the sewing operation in the Model 1335 it sold to Sealy.  The February 11, 2001 video appears to show a reduction to practice of a machine that contains all of the elements in Claim 32.   In the video, the machine operates successfully over and over, requiring operator intervention only to finish the gusset after the four ruffled gusset corners had been sewn and to put a new panel on the table to restart the process.   Thus, the 1335 Model was likely ready for patenting at the time AAC sold it to Sealy, satisfying the second prong.

The determination of whether the commercial offer for sale prong is negated by the experimental use exception is highly fact-specific.[4]  Here, there are facts both supporting and opposing the defense of experimental use.[5]  Most importantly, if the invention in Claim 32 was reduced to practice on February 11, 2001, the

---

[4]The Federal Circuit has given the following factors for guidance: "the amount of control over the experiments retained by the inventor, the length of the test period, whether records of the experiments were kept, who conducted the experiment, the degree of commercial exploitation during testing, whether testing was systematically performed, and whether the inventor continually monitored the invention during testing."   Allen Eng'q Corp. v. Bartell Indus., 299 F.3d 1336, 1354-55 (Fed. Cir. 2002).

[5]The parties dispute the facts surrounding the use of the machines sold prior to the critical date and whether the factors favor a finding of experimental use.   The Court declines to address the experimental use factors here because the most substantial fact favoring the on-sale bar is that the Model 1335 may have been reduced to practice at the time the sale/offer for sale took place.

experimental use defense is unavailable. See Zacharin v. United States, 213 F.3d 1366, 1369 (Fed. Cir. 2000) (stating that "once an invention has been reduced to practice, it can no longer meet the experimental use exception"); RCA Corp. v. Data General Corp., 877 F.2d 1056, 1061 (Fed. Cir. 1989) (explaining that "experimental use, which means perfecting or completing an invention to the point of determining that it will work for its intended purpose, ends with an actual reduction to practice"). As stated above, Plaintiff's argument that the Model 1335 did not contain an independent pleat generator before the critical date does not remove it from the scope of Claim 32. Nor does Plaintiff's argument that testing the Model 1335 was necessary to determine its readiness for use in actual production conditions mean that the invention had not been reduced to practice. Reduction to practice requires only that the invention work for its intended purpose, not that it be a "viable commercial embodiment." See Taskett v. Dentlinger, 344 F.3d 1337, 1342 (Fed. Cir. 2003). Testing under actual conditions of use is not required. See id. Accordingly, the Model 1335 could have been reduced to practice so long as sufficient testing had been performed to show that the invention worked for its intended purpose. See id. It appears that sufficient testing had been performed and that the machine worked for its intended purpose of creating ruffled gusset corners on February 11, 2000, eliminating the possibility that subsequent testing fell within the experimental use exception. Because L&P has raised a substantial question about the on-sale bar, AAC has not shown a sufficient

40

likelihood of successfully proving the validity of the '603 Patent at trial.  <u>New England Braiding Co.</u>, 970 F.2d 878, 882-83.

    b.   <u>Validity of the '815 Patent</u>

Because the Court finds that Plaintiff has not shown a likelihood of successfully proving infringement of the '815 Patent at trial, the Court need not reach the issue of the validity of the '815 Patent.

## B. <u>Irreparable Harm</u>

The moving party is entitled to a presumption of irreparable harm if a clear showing of both validity and infringement has been made.  <u>See</u> <u>Polymer Techs., Inc. v. Bridwell</u>, 103 F.3d 970, 974 (Fed. Cir. 1996).  As Plaintiff has not made a clear showing of both infringement and validity for either Patent, Plaintiff is not entitled to such a presumption.  Nevertheless, Plaintiff has argued several points that support a finding of irreparable harm. Plaintiff and Defendant are direct competitors, such that any business Defendant gains through its alleged infringement may translate into business lost for Plaintiff.  The Federal Circuit has recognized that it may be impossible through money damages to return a competitor to the position it would have been absent infringement.  <u>See</u> <u>Polymer Techs. v. Bridwell</u>, 103 F.3d 970, 975-76 (Fed. Cir. 1996); <u>Hybritech, Inc.</u>, 849 F.2d at 1457.  Mattress manufacturing machines have a useful life of several years, so a lost sale can mean a lost opportunity to sell to that customer for several years.  There is additional advantage to being an incumbent supplier of machines because factories often won't

switch brands, as it involves retraining employees and restocking supplies and spare parts.  Calculating damages from lost sales of the supplies, parts and service typically purchased along with a machine would be speculative, and thus favors a finding of irreparable harm.  Also, Plaintiff has not licensed the Patents, other than licensing the '815 Patent back to Sealy, which shows that Plaintiff has not chosen to forego its granted exclusivity for compensation.  See Polymer Techs., 103 F.3d at 976.  Although Defendant's allegedly infringing series of machines had been on the market for a few years before Plaintiff brought this action, Plaintiff's delay was not unreasonable given the short time between gaining ownership of the Patents and bringing suit, and given the fact that Plaintiff filed the instant motion for preliminary injunction along with the complaint.  Thus, the delay does not preclude a finding of irreparable harm.

Nevertheless, other facts support a finding that Plaintiff could be adequately compensated monetarily.  First, many of Plaintiff's damages are calculable.  For example, Elvin Price, President and CEO of AAC, cited specific figures regarding the drop in its machine pricing and stated that the dollar value lost in individual sales can be calculated.  Also, there is no evidence that Defendant is not financially able to pay an award of damages.

Thus, Plaintiff is suffering some irreparable harm from Defendant's alleged infringement, and this factor favors Plaintiff.  However, because much of Plaintiff's loss is calculable, this factor favors Plaintiff only slightly.

C. Balance of Hardships

"The magnitude of the threatened injury to the patent owner is weighed, in the light of the strength of the showing of likelihood of success on the merits, against the injury to the accused infringer if the preliminary decision is in error." H.H. Robertson Co. v. United Steel Deck, 820 F.2d 384, 390 (Fed. Cir. 1987), overruled on other grounds by Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995).

Plaintiff spent years designing its patented ruffled gusset and gusset ruffler as part of a joint research and development effort with Sealy, which culminated in two patents. Being wrongfully deprived of the exclusivity granted by the Patents would be a serious injury to Plaintiff. For the reasons discussed in the irreparable harm analysis, losing sales in this market is a significant hardship. However, in light of Plaintiff's showing of likelihood of success, the hardship to Plaintiff of losing sales due on infringement is offset by the hardship to Defendant of losing sales due to an erroneous preliminary injunction decision. The companies differ greatly in size. Defendant had $5.1 billion in sales in 2004, presumably making it more able to withstand the hardship of lost sales than Plaintiff, a much smaller company. Although the timeline of events suggests that Defendant abused its confidential access to Plaintiff's machine prototypes, there is no proof that Defendant violated the confidentiality agreement or that Defendant's engineers who designed the GPT Rufflers had any exposure to information about Plaintiff's prototypes. Nevertheless, the circumstantial evidence

43

of copying, combined with Defendant's comparative financial security, tip the balance of hardships in favor of Plaintiff.

    D. Public Interest

The public interest would not be significantly affected by the grant or denial of a preliminary injunction in this case. "[A]lthough there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." Hybritech, Inc. v. Abbott Labs., 849 F.2d 1446, 1458 (Fed. Cir. 1988); Cordis Corp. v. Boston Sci. Corp., 99 Fed. Appx. 928, 935 (Fed. Cir. 2004) (explaining that this factor would be obliterated if the public's interest in enforcing patents were to control in every case, and that courts have refused an injunction based on this factor when it would injure public health). Because the technology in this case does not involve a critical public interest, the only public interest is in enforcing valid patents. Such interest is counterbalanced by the interest in allowing valid competition, and thus this factor favors neither side.

VI. Conclusion

The Court has found that the irreparable harm and balance of hardship factors tip in Plaintiff's favor. However, most important is the Court's finding that Plaintiff did not show the required likelihood of success on the merits for either Patent. Given this deficit, a preliminary injunction is inappropriate. See Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343,

1350 (Fed. Cir. 2001) (stating that "case law and logic both require that a movant cannot be granted a preliminary injunction unless it establishes both of the first two factors").   Thus, Plaintiff's Motion for Preliminary Injunction [#2] is DENIED. Having decided the aforesaid motion without a hearing, Plaintiff's Request for Expedited Hearing on its Motion for Preliminary Injunction [#3] is also DENIED.

Further, for the reasons stated above, Defendant's Motion to Strike the Supplemental Declaration of Ben Kuchel [#44] is DENIED; Plaintiff's Motion to Exclude the Expert Declaration and Testimony of Thomas Sanfilippo [#55] is DENIED; Defendant's Motion to Exclude the Expert Report and Testimony of Dale Lischer [#56] is GRANTED IN PART and DENIED IN PART; and Defendant's Motion for Leave to File Sur-Reply Brief or Alternatively, to Strike Declarations [#69] is GRANTED NUNC PRO TUNC.

SO ORDERED, this ___30___ day of March, 2006.

_____
ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE